**Slip Op. 03-112**

UNITED STATES COURT OF INTERNATIONAL TRADE

_____
                                          :
HORNOS ELECTRICOS DE                      :
VENEZUELA, S.A. (HEVENSA),                :
                                          :
            Plaintiff,                     :
                                          :
    v.                                     :
                                          :          Before:  WALLACH, Judge
UNITED STATES,                            :          Court No.: 02-00452
                                          :
            Defendant,                     :
                                          :          **PUBLIC VERSION**
    and                                    :
                                          :
ERAMET MARIETTA, INC.,                    :
                                          :
            Defendant-Intervenor.          :
_____:


[Plaintiff's Rule 56.2 Motion for Judgment Upon the Agency Record Denied.]


                                          Decided: August 29, 2003

Aitken Irvin Berlin & Vrooman, LLP (Bruce Edward Aitken) for Plaintiff.

Peter D. Keisler, Assistant Attorney General, Civil Division, United States Department of Justice; David M. Cohen, Director, Commercial Litigation Branch, Civil Division; Reginal T. Blades, Jr., Senior Trial Counsel; Marisa Beth Goldstein, Office of the Chief Counsel for Import Administration, United States Department of Commerce, Of Counsel, for Defendant.

Piper Rudnick, LLP (William D. Kramer, Clifford E. Stevens, Jr.) for Defendant-Intervenor.


                            **OPINION**

**WALLACH, Judge:**


                              1

# I
## Introduction

This matter comes before the court on Plaintiff Hornos Electricos de Venezuela S.A.'s ("HEVENSA") Rule 56.2 Motion for Judgment Upon the Agency Record ("HEVENSA's Motion"), in which HEVENSA challenges certain aspects of the final determination of the United States Department of Commerce ("Commerce") in Notice of Final Determination of Sales at Less Than Fair Value; Silicomanganese from Venezuela, 67 Fed. Reg. 15,533 (Apr. 2, 2002) ("Final Determination"). The period of investigation ("POI") covered by the Final Determination was April 1, 2000 through March 31, 2001. Id. at 15,534. For the reasons that follow, HEVENSA's Motion is denied.

# II
## Factual and Procedural Background

On April 6, 2001, Defendant-Intervenor Eramet Marietta, Inc., along with another petitioner, filed a petition with Commerce and the United States International Trade Commission ("ITC") requesting the imposition of antidumping duties on imports of silicomanganese from India, Kazakhstan, and Venezuela. See Notice of Initiation of Antidumping Duty Investigations: Silicomanganese From Kazakhstan, India and Venezuela, 66 Fed. Reg. 22,209 (May 3, 2001). On April 26, 2001, Commerce initiated antidumping investigations of silicomanganese from these countries. Id. On May 21, 2001, the ITC notified Commerce of its preliminary determination that there was a reasonable indication that an industry in the United States was materially injured by reason of imports of silicomanganese from India, Kazakhstan, and Venezuela. See Silicomanganese from India, Kazakhstan, and Venezuela, 66 Fed. Reg. 31,258

(June 11, 2001).

On November 9, 2001, Commerce published its preliminary determination of sales at less than fair value of silicomanganese from Venezuela. See Notice of Preliminary Determination of Sales at Less Than Fair Value; Silicomanganese From Venezuela, 66 Fed. Reg. 56,635 (Nov. 9, 2001) ("Preliminary Determination").

In its Preliminary Determination, Commerce determined, inter alia: (1) not to accept HEVENSA's claim for a duty drawback adjustment; (2) that no level of trade ("LOT") adjustment was warranted because only one LOT existed in HEVENSA's home market; (3) not to allow an adjustment to HEVENSA's cost of production ("COP") for a transformer failure that occurred during the POI; (4) that the date of invoice was the proper date of sale for all of HEVENSA's home market and U.S. sales; and (5) to use average short-term lending rates calculated by the United States Federal Reserve (the "Federal Reserve") to calculate HEVENSA's home market imputed credit expenses. Id. at 56,636-638; see also Memorandum from Deborah Scott, Analyst, through Robert James, Program Manager, and Michael Heaney, Team Leader, to The File, Analysis of Data Submitted by Hornos Electricos de Venezuela, S.A. (HEVENSA) for the Preliminary Determination of the Antidumping Investigation of Silicomanganese from Venezuela (A-307-820) (Nov. 2, 2001) ("Preliminary Analysis Memo") at 2-8; Nonconfidential Appendix to Brief of Eramet Marietta Inc. in Opposition to HEVENSA's Motion for Judgment Upon the Agency Record ("Eramet Pub. App.") 2. Based on a comparison of HEVENSA's U.S. sales prices ("USP") to normal value ("NV") during the POI , Commerce found that silicomanganese from Venezuela was sold at less than fair value. Preliminary Determination, 66 Fed. Reg. at 56,635.

From November 28, 2001 through December 9, 2001, after publication of the Preliminary Results, Commerce "conducted a verification of the sales and cost questionnaire responses" submitted by HEVENSA and issued a sales verification report. Final Determination, 67 Fed. Reg. at 15,534. In its Final Determination, Commerce's determinations regarding these issues remained essentially unchanged, and the agency calculated a dumping margin for HEVENSA of 24.62 percent. Final Determination, 67 Fed. Reg. at 15,535.

The ITC notified Commerce of its final affirmative injury determination on May 16, 2002. See Silicomanganese from India, Kazakhstan, and Venezuela, 67 Fed. Reg. 35,832 (May 21, 2002). On May 23, 2002, Commerce published the antidumping duty order on silicomanganese from Venezuela. See Notice of Amended Final Determination of Sales at Less Than Fair Value and Antidumping Duty Orders: Silicomanganese From India, Kazakhstan, and Venezuela, 67 Fed. Reg. 36,149 (May 23, 2002).

**III**
**Jurisdiction and Standard of Review**

Jurisdiction lies pursuant to 28 U.S.C. § 1581(c) (1994). The court must sustain Commerce's determination in an antidumping investigation unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i) (1999). Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consol. Edison Co. v. Labor Bd., 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938). To be in accordance with law, Commerce's actions must be "reasonable under the terms of the relevant statute." Shakeproof Assembly Components Div. of Ill. Tool Works, Inc. v. United States, 102 F. Supp. 2d 486, 489

4

(CIT 2000). This court must defer to Commerce's reasonable interpretation of the statute. See Koyo Seiko Co. v. United States, 36 F.3d 1565, 1570 (Fed. Cir. 1994). This deference is based upon the recognition that "Commerce's special expertise in administering the anti-dumping law entitles its decisions to deference from the courts." Ta Chen Stainless Steel Pipe, Inc. v. United States, 298 F.3d 1330, 1335 (Fed. Cir. 2002).

**IV**
**Analysis**

On appeal, HEVENSA argues that

> (a) a duty drawback adjustment should have been allowed; (b) two, rather than one, levels of trade should have been recognized; (c) a cost of production adjustment should have been permitted due to the transformer meltdown as this was the equivalent of a force majeure event; (d) contract date, rather than invoice date, should have been used as a date of sale; and (e) actual home market credit expenses should have been used . . . .[1]

HEVENSA's Motion at 3.

A
Commerce's Decision to Deny HEVENSA's Claim for an Upward Duty Drawback Adjustment to HEVENSA's Export Prices is Supported by Substantial Evidence and in Accordance with Law

19 U.S.C. § 1677a(c)(1)(B) provides for an upward adjustment to export price for import duties that are "imposed by the country of exportation which have been rebated, or which have

---

[1] HEVENSA presents its case before this court largely by incorporating, by reference, portions of submissions made to Commerce prior to the Final Determination. In fact, HEVENSA's brief, containing five issues for appeal, contains barely three pages of "discussion." The court finds this method of briefing a case highly unusual, of little assistance to the court, and essentially tantamount to a concession that HEVENSA's arguments lack merit. HEVENSA chose to raise, in its reply brief, arguments that should have been made initially, thus denying the other parties an opportunity to fully respond. If those arguments were of great moment here, the court would permit Defendant and Defendant-Intervenor another opportunity to respond in writing.

not been collected, by reason of the exportation of the subject merchandise to the United States."

Id. § 1677a(c)(1)(B) (1999). The purpose of a duty drawback adjustment is to prevent dumping margins from arising because the exporting country rebates import duties and taxes for raw materials used in exported merchandise. Far East Mach. Co. v. United States, 12 CIT 428, 430 (1988). In other words, a duty drawback adjustment takes into account any difference in the prices for home market or normal value and export sales accounted for by the fact that such import duties have been paid on inputs used to produce the merchandise sold in the home market, but have not been paid on inputs used to make the merchandise exported to the United States.

"A respondent seeking a duty drawback adjustment may base its claim on a foreign government program that either provides respondent with a rebate for import duties, or grants to respondent an exemption from import duties, for imported merchandise that is subsequently exported." Allied Tube & Conduit Corp. v. United States, 132 F. Supp. 2d 1087, 1093 (CIT 2001). In order to determine whether respondent is entitled to a duty drawback adjustment, Commerce has employed a two-prong test that determines whether: (1) the import duty paid and rebate payment are directly linked to, and dependent upon, one another; and (2) there are sufficient imports of the imported raw materials to account for the duty drawback on the exports of the manufactured product. Federal-Mogul Corp. v. United States, 862 F. Supp. 384, 410 (CIT 1994) (citing U.S. Int'l Trade Admin., U.S. Dep't of Commerce, "Study of Antidumping Adjustments Methodology and Recommendations for Statutory Change" 26 (1985) ("1985 Adjustment Study")). This court has held that to satisfy the first prong of Commerce's duty drawback test, the party claiming the adjustment must establish that "import duties are actually paid and rebated, and there is a sufficient link between the cost to the manufacturer (import

6

duties paid) and the claimed adjustment (rebate granted)." Far East Mach. Co., 12 CIT at 976 (quoting Huffy Corp. v. United States, 632 F. Supp. 50, 53 (CIT 1986)).

Commerce rejected HEVENSA's claim for a duty drawback adjustment based on two grounds. First, Commerce explained that although HEVENSA "described the duty drawback program in which it participated as an 'exemption program,' the regulations it provided in its original questionnaire response described a 'refund program.'" Preliminary Analysis Memo at 7. Second, Commerce charged that HEVENSA "failed to provide certain documentation requested by the Department." Id. Specifically, Commerce explained that it requested that HEVENSA provide copies of all documentation related to its duty drawback claim and that, while HEVENSA provided a copy of an authorization from the Venezuelan government for duty-free importation, it did not provide copies of the five applications referenced in the authorization. See id. Thus, Commerce rejected HEVENSA's claim because the company did not provide the agency with evidence sufficient to warrant an adjustment.

HEVENSA argues that Commerce should reconsider its decision to disallow HEVENSA's claim for a duty drawback adjustment and specifies that its "position in this regard was detailed in paragraphs 19-20 of our November 29, 2001 submission,[2] which we incorporate by reference here." HEVENSA's Motion at 4. Those paragraphs explain that HEVENSA mistakenly filed with the Department the duty drawback regulations in effect in

---

[2] HEVENSA's November 29, 2001 submission is a letter in which HEVENSA memorialized a statement of minor clarifications and minor corrections of previously submitted data made at the beginning of sales verification on November 28, 2001. See Letter from Aitken Irvin Berlin & Vrooman to Honorable Donald Evans, Secretary of Commerce, U.S. Department of Commerce Re: Silicomanganese from Venezuela, Investigation Submission (Nov. 29, 2001) ("HEVENSA Nov. 29 Letter"); Confidential Appendix to Defendant's Opposition to Plaintiff's Motion for Judgment Upon the Agency Record ("Defendant's Conf. App.") at Tab C.

7

> Venezuela at the time of the original investigation seven years ago. During the POI, HEVENSA availed itself of the current Venezuelan duty exemption program, rather than a duty refund program. But, in fact, HEVENSA subsequently remedied this error. Specifically, HEVENSA filed excerpts from the duty exemption program. . . . Since HEVENSA availed itself of the duty exemption program, rather than a duty drawback program, of course it did not file duty drawback "applications". This is the procedure under U.S. duty drawback law, but not under Venezuelan law. What HEVENSA did do was to comply with Venezuelan law and file reports of its activities in availing itself of the duty exemption program.

HEVENSA Nov. 29 Letter at 6; Defendant's Conf. App. at Tab C. HEVENSA thus articulated that it had participated in a duty drawback program in which it was exempt from paying, rather than receiving a rebate on, import duties on certain inputs used to produce silicomanganese for export.

Based on this explanation, Commerce examined whether import duties were not collected (i.e., exempted) on imported inputs because those inputs were used to produce silicomanganese that was exported. Commerce explained that the documentation on record did in fact show that import duties were not paid by HEVENSA on certain inputs because "HEVENSA indicated that it intended to use those inputs to produce silicomanganese for export." Memorandum from Joseph A. Spetrini, Deputy Assistant Secretary AD/CVD Enforcement Group III, to Faryar Shirzad, Assistant Secretary for Import Administration, Issues and Decision Memorandum for the Final Determination of the Antidumping Investigation of Silicomanganese from Venezuela (A-307-820) at 15 (Mar. 25, 2002) ("Issues and Decision Memo"); Eramet Pub. App. 4. However, Commerce also noted that there was no evidence on the record demonstrating that HEVENSA did pay import duties on inputs used in the production of silicomanganese sold in the home market. Id. To address this discrepancy, Commerce issued a supplemental questionnaire on August 14, 2001, requesting that HEVENSA submit a worksheet and supporting

8

documentation demonstrating that the silicomanganese sold in the home market during the POI was produced using imported material on which the import duty was paid. Id. Despite this opportunity, HEVENSA did not respond Commerce's request and "at no point in this proceeding did Hevensa seek to establish it had paid import duties used in the production of silicomanganese sold in the home market." Id.

"As with all favorable adjustments to normal value or export price, respondent bears the burden of establishing both prongs of the [duty drawback] test, and therefore, its entitlement to a duty drawback adjustment." Allied Tube & Conduit Corp., 132 F. Supp. 2d at 1093; see Fujitsu Gen. Ltd. v. United States, 88 F.3d 1034, 1040 (Fed. Cir. 1996) ("Commerce has reasonably placed the burden to establish entitlement to adjustments on [respondent], the party seeking the adjustment and the party with access to the necessary information."); see also Primary Steel, Inc. v. United States, 17 CIT 1080, 1090, 834 F. Supp. 1374, 1383 (1993) ("The burden of creating a record from which the ITA could determine whether [respondent] was entitled to a duty drawback adjustment rested with [respondent], not Commerce.").

While HEVENSA has established that it was exempt from paying import duties on inputs used to produce silicomanganese for export, it has failed to establish that it *paid* import duties on inputs used to produce silicomanganese sold in Venezuela. Commerce has reasonably established the payment of import duties on imports used for sales in the domestic market as a necessary prerequisite for the establishment of a duty drawback claim. See e.g., Final Results of Antidumping Duty Administrative Review: Silicon Metal from Brazil, 63 Fed. Reg. 6,899, 6,909 (Feb. 11, 1998) ("Payment of . . . duties on the importation of inputs used for domestic sales, but not for export sales, is necessary to establish a drawback claim"). HEVENSA's failure to create

9

a record showing the payment of duties on the importation of inputs used for domestic sales, but not for export sales, defeats its duty drawback claim. Commerce's denial of HEVENSA's claim for a duty drawback adjustment is thus supported by the record and in accordance with the law.

## B
## Commerce Properly Determined That Only One Level of Trade Existed for HEVENSA's Home Market Sales

In determining whether subject merchandise is being, or is likely to be, sold at less than fair value, Commerce makes a comparison between the export price ("EP") or constructed export price ("CEP") and normal value. 19 U.S.C. § 1677b(a) (1999). Normal value is the comparable price for a product like the imported merchandise when first sold "for consumption in the exporting country, in the usual commercial quantities and in the ordinary course of trade and, to the extent practicable, at the same level of trade as the export price or constructed export price." Id. § 1677b(a)(1)(B)(i). Thus, the antidumping statue requires Commerce to determine normal value based, to the extent it is practicable to do so, on foreign market sales at the same level of trade ("LOT") as the export price of U.S. sales. Id. If Commerce cannot find sales in the foreign market at the same LOT as U.S. sales, it will compare U.S. sales and foreign market sales at a different LOT. If Commerce determines that U.S. sales are made at a different LOT than foreign market sales, the antidumping statute provides for an adjustment to normal value when certain factors are satisfied. See id. § 1677b(a)(7)(A).

Commerce's regulations indicate that the agency "will determine that sales are made at different levels of trade if they are made at different marketing stages (or their equivalent).

10

Substantial differences in selling activities are a necessary, but not sufficient, condition for determining whether there is a difference in the stage of marketing." 19 C.F.R. § 351.412(c)(2) (2002). The Statement of Administrative Action ("SAA")[3] also provides that "a difference between the actual functions performed by the sellers at the different levels of trade in the two markets" is a requisite factor in finding that there is a difference in the LOT and an adjustment is thus warranted. Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-465, at 829 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4168. "In sum, to qualify for a LOT adjustment, a party must demonstrate that the difference in level of trade: (1) involves the performance of different selling activities; and (2) affects price comparability, as evidenced by a consistent pattern of price differences." Koyo Seiko Co. v. United States, 22 CIT 424, 427 (1998).

> In its Preliminary Determination, Commerce found that
>
> [i]n the home market HEVENSA reported two channels of distribution–sales to end users, and sales to a trading company. For both channels of distribution in the home market, HEVENSA performed similar selling functions, including sales logistics and inventory maintenance. Because channels of distribution do not qualify as separate levels of trade when the selling functions performed for each channel are sufficiently similar, we have determined that one LOT exists for HEVENSA's home market sales.

Preliminary Determination, 66 Fed. Reg. at 56,637 (internal citations omitted).

---

[3] The SAA represents "an authoritative expression by the Administration concerning its views regarding the interpretation and application of the Uruguay Round agreements." H.R. Doc. No. 103-316, at 656 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040. "It is the expectation of the Congress that future Administrations will observe and apply the interpretations and commitments set out in this Statement." Id.; see also 19 U.S.C. § 3512(d) (1994) ("The statement of administrative action approved by the Congress . . . shall be regarded as an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and this Act in any judicial proceeding in which a question arises concerning such interpretation or application.").

11

HEVENSA argues that Commerce should reconsider its decision to treat HEVENSA's two channels of distribution for home market sales as one level of trade. However, HEVENSA concedes in its reply brief that it performed similar selling functions for sales to both customers: "HEVENSA, although performing similar selling functions for customers in each channel of distribution, does so at different degrees." Reply Brief of Hornos Electricos de Venezuela S.A. (HEVENSA) in Support of Motion for Judgment Upon the Agency Record ("HEVENSA Reply") at 12.

HEVENSA argues that its sales to different types of customers in the home market "do not and cannot involve the same degree or character of selling functions," id., and that Commerce has found selling functions provided in varying degrees can qualify for a LOT adjustment. In support of its argument that a difference in *degrees* of selling functions can provide a sufficient basis for a LOT adjustment to normal value, HEVENSA cites <u>Notice of Final Determination of Sales at Less Than Fair Value and Negative Final Determination of Critical Circumstances: Certain Cold-Rolled Carbon Steel Flat Products from Argentina</u>, 67 Fed. Reg. 62,138 (Oct. 3, 2002) ("CRCSFP from Argentina") and accompanying Memorandum from Richard W. Moreland, Deputy Assistant Secretary for Import Administration, to Faryar Shirzad, Assistant Secretary for Import Administration, Issues and Decision Memorandum for the Final Determination of the Antidumping Duty Investigation of Certain Cold-Rolled Carbon Steel Flat Products from Argentina ("Issues and Decision Memo for CRCSFP from Argentina") (Oct. 2, 2002). In CRCSFP from Argentina, Commerce noted that it does not ignore variations in degree or cost of selling activities, but in fact "reqeust[s] consistently that respondents provide information as to the degree of involvement of a selling activity/function which we then use to

analyze and evaluate claims regarding channels of distribution and levels of trade." Issues and Decision Memo for CRCSFP from Argentina at 5. Commerce found that the respondent in that case provided its end-users in the home market a greater degree of the following selling functions, among others, than it provided its distributors in the same market: "(1) inventory maintenance; (2) pre-sale service; (3) technical advice; (4) freight and delivery arrangement; (5) market research; (6) computer assistance; and (7) management operations advice." Id. Using inventory maintenance as an example, Commerce explained that "although this selling function/activity was present for sales to end-users and to distributors, a significantly higher degree of involvement was required for sales to end-users compared to sales to distributors." Id. "[A] wide range of different gauges, widths, lengths, and quantities of [carbon steel flat products] was required to be maintained as inventory to meet end-user requirements whereas the distributors provided for their customers many of these services such as cutting to length, slitting, etc." Id.

In contrast, Commerce in the present case found that "Hevensa reported it did not incur any advertising, technical service, or warranty expenses; therefore, no differences can exist for these selling functions." Issues and Decision Memo at 18; Eramet Pub. App. 4. Regarding the selling functions HEVENSA did perform (sales logistics and inventory maintenance), Commerce concluded that HEVENSA's performance of these selling functions was "sufficiently similar" to conclude that only one LOT existed for HEVENSA's home market sales. Commerce grounded its decision on the basis that "Hevensa has not pointed to any information on the record that would lead us to make a different conclusion, nor has it explained why the Department should make a finding that there are two LOTs in the home market." Id.

13

While Commerce may scrutinize the degree of involvement of a company's selling activities in determining whether or not to grant a LOT adjustment, where the record reveals a paucity of evidence that selling activities differ, Commerce need not delve into differences in degrees. The court finds that Commerce's decision to deny HEVENSA a LOT adjustment is supported by substantial evidence. Commerce has the discretion to make a LOT adjustment if certain conditions are met, a crucial one being "if the difference in level of trade . . . involves the performance of different selling activities . . . ." 19 U.S.C. § 1677b(a)(7)(A)(i). However, Commerce cannot make a LOT adjustment when the record at issue does not provide adequate evidence to support the conclusion that different selling activities are performed in a chosen market. The record does not reveal that there were any differences in selling functions between HEVENSA's two types of home market customers. See HEVENSA's Response to the Department's Questionnaire Concerning Sections B, C, and D (July 24, 2001) (describing HEVENSA's home market sales process); Prop. Doc. 35 at 6-10; Confidential Appendix to Brief of Eramet Marietta Inc. in Opposition to HEVENSA's Motion for Judgment Upon the Agency Record ("Eramet Conf. App.") 5. HEVENSA "[did not differ regarding] any discounts or rebates on its home-market sales"; "[[did not differ regarding] commission payments to any parties on its home-market sales]"; "did not incur warranty, guaranty or servicing expenses on home-market sales"; "has not paid any amounts in settlements to cover liabilities incurred on silicomanganese sold in the home-market"; and "did not incur any advertising nor sales promotion expenses in connection with its home-market sales." Id. at 3-6. Here, HEVENSA did not, and apparently cannot, demonstrate that there are two levels of trade in its home market because its selling functions to both customers in its home market are the same. Accordingly, the court finds that

14

Commerce's determination that HEVENSA's distribution channels qualified as one LOT is supported by substantial evidence and in accordance with law.

C
Commerce's Properly Disallowed HEVENSA's Adjustment to its Cost of Production to Account for a Transformer Failure

HEVENSA experienced two transformer meltdowns during the POI: one in July 2000 and another in December 2000. Memorandum From Deborah Scott, Case Analyst; Patricia Tran, Case Analyst; and Michael J. Heaney, Team Leader, through Robert James, Program Manager, to The File, Silicomanganese from Venezuela-COP/CV Verification of Hornos Electricos de Venezuela (Jan. 29, 2002) ("COP Verification Memo") at 3; Eramet Pub. App. 11. The December 2000 meltdown led to a shutdown of plant production during a period of 11 days, ending January 7, 2001. HEVENSA's Response to the Department's Questionnaire Concerning Sections B, C, and D (July 24, 2001); Prop. Doc. 35 at 11; Eramet Conf. App. 5. According to HEVENSA, the transformer incident "resulted in extraordinary expenses to rent a new transformer and lay-off a substantial number of workers, and had the effect of reducing the plant production capacity to 40% of installed capacity until April 15th, 2001." Id. Based on these facts, HEVENSA argued that it was "necessary to compensate the extraordinary expenses incurred during the period between December 2000, and March 2001, and the reduction in production volume, which had an extremely negative effect on Fixed Overhead Unit Costs and Depreciation, increasing their value by an average of [significantly] with respect to the Normal Fixed Overhead costs and Depreciation, incurred in the period of April to November 2000." Id. HEVENSA thus made a downward adjustment to its fixed overhead costs so that its per-unit

15

costs for the entire POI were equivalent to those computed for the portion of the POI prior to the transformer incident. Preliminary Analysis Memo at 3; Eramet Conf. App. 2. A downward adjustment resulting in a lower cost of production ("COP")[4] would result in additional sales being made at prices above COP, an increase in NV, and a corresponding decrease in the dumping margin. See e.g., Thai Pineapple Canning Indus. Corp. v. United States, 273 F.3d 1077, 1080 (Fed. Cir. 2001) (stating that "a higher cost of production brings about a higher normal value, which in turn creates a higher dumping margin" and that it "is therefore advantageous to a foreign producer to demonstrate as low a cost of production as possible").

Commerce disallowed HEVENSA's claim for a downward COP adjustment on the ground that the increase in HEVENSA's costs due to the transformer meltdown were not extraordinary in nature. Preliminary Analysis Memo at 3; Eramet Conf. App. 2. Instead, Commerce recalculated fixed overhead costs using actual production volumes and actual costs for the pre- and post-accident periods. Id. HEVENSA now argues before the court that "the transformer meltdown should be considered a force majeure event" and "should be recognized as the source of extraordinary costs, thus justifying a credit for fixed overhead expenses." HEVENSA's Motion at 5.

Commerce shall normally calculate the COP based on the exporting company's records,

---

[4] "Cost of Production is calculated according to a statutory formula by adding together several costs and expenses, including the cost of materials, fabrication, containers, coverings, and other processing costs, and selling, general, and administrative expenses." Thai Pineapple Canning Indus. Corp. v. United States, 271 F.3d 1077, 1080 (Fed. Cir. 2001); 19 U.S.C. § 1677b(b)(3) (1999). "Whenever the administering authority has reasonable grounds to believe or suspect that sales of the foreign like product under consideration for the determination of normal value have been made at prices which represent less than the cost of production . . . such sales may be disregarded." 19 U.S.C. § 1677b(b)(1) (1999).

16

as long as such records are kept in accordance with the home country's generally accepted accounting principles ("GAAP") and reasonably reflect the costs associated with the production and sale of the merchandise. 19 U.S.C. § 1677b(f)(1)(A). The SAA dictates that "[c]osts shall be allocated using a method that reasonably reflects and accurately captures all of the *actual costs* incurred in producing and selling the product under investigation or review." SAA at 835 (emphasis added). Consistent with this dictate, Commerce's practice is to calculate COP based on actual costs incurred during the POI. See Silicon Metal from Brazil; Final Results of Antidumping Duty Administrative Review, 61 Fed. Reg. 46,763, 46,769 (Sept. 5, 1996) (stating Commerce's position that "COP/CV data should be based upon actual results and not projections"); Final Determination of Sales at Less Than Fair Value: Oil Country Tubular Goods from Austria, 60 Fed. Reg. 33,551, 33,557 (June 28, 1995) ("The Department's practice is to calculate the respondent's fully absorbed cost of production for the POI. By fully absorbed cost the Department means *actual cost incurred in the POI . . ..*") (emphasis added).

In this case, the court finds that Commerce correctly denied HEVENSA's claim for a downward adjustment for fixed overhead costs because HEVENSA failed to establish (1) that it incurred extraordinary costs due to the transformer meltdown, and (2) that such failures qualified as extraordinary events.

1
HEVENSA Did Not Provide Sufficient Evidence that it Incurred Extraordinary Costs as a Result of the Transformer Meltdown

While HEVENSA claimed that it incurred higher fixed overhead costs because of the transformer failures, the record does not support HEVENSA's claim. Commerce examined

17

HEVENSA's accounting treatment of the transformer shutdowns, and found that HEVENSA "did not make any adjustments in its normal accounting system to reflect the lower production volumes or its claimed higher costs. Nor does the record demonstrate Hevensa made any changes to its accounting methodology." Issues and Decision Memo at Comment 4; Eramet Pub. App. 4. Further, Commerce noted that "Hevensa has not offered any support for its assertion that the transformer failures led to extraordinary expenses." Id. Thus, based on the actual evidence HEVENSA submitted for the record, Commerce concluded that the transformer failures did not lead to extraordinary expenses.

As noted, the burden to establish entitlement to adjustments rests with the party seeking the adjustment and the party with access to necessary information. See Fujitsu Gen. Ltd., 88 F.3d at 1040. HEVENSA argues that "[e]vidence that HEVENSA incurred an extraordinary [change] in its per-unit and overall costs as a result of its transformer meltdowns has been well provided to [sic] and subsequently verified by the Department." HEVENSA Reply at 12-13. Specifically, HEVENSA states that "HEVENSA's report to the Venezuelan Ministry stated in substance that 'HEVENSA had been assuming extraordinary costs and expenses during approximately one year regarding the first case (first transformer failure) and six months regarding the second case (second transformer failure).'" Id. However, as noted, "[c]osts shall normally be calculated based on the records of the exporter or producer of the merchandise . . . ." 19 U.S.C. § 1677b(f). That HEVENSA reported its transformer meltdown to the Venezuelan Ministry does not change the fact that HEVENSA never specifically identified or quantified the increased expenses it claims. In the absence of evidence produced by HEVENSA showing that the transformer incident produced extraordinary costs HEVESA was forced to incur, Commerce reasonably

18

concluded that the transformer failures did not warrant a downward adjustment to HEVENSA's COP.

## 2
## Commerce Acted in Accordance with Law by Concluding that the Transformer Meltdown Did Not Constitute a Force Majeure Event

Commerce also acted in accordance with law by concluding that the transformer failures did not constitute an extraordinary event. The SAA directs that "[i]n determining whether a company's records reasonably reflect costs, Commerce will consider U.S. generally accepted accounting principles ["U.S. GAAP"] employed by the industry in question." SAA at 834. "To be considered an 'extraordinary' event giving rise to extraordinary treatment under U.S. GAAP, the event must be unusual in nature and infrequent in occurrence." Floral Trade Council v. United States, 16 CIT 1014, 1016 (1992). An event is unusual in nature if it "possesses a high degree of abnormality and is of a type clearly unrelated to, or only incidentally related to, the ordinary and typical activities of the enterprise." Financial Accounting Standards Board, Accounting Standards Current Text, General Standards ("FASB") § 17.107(a) at 24,469.[5] An event is infrequent in occurrence if it "is of a type that would not reasonably be expected to recur in the foreseeable future." Id. § 17.107(b) at 24,469.

The record establishes that HEVENSA experienced two transformer failures: one in July 2000 in addition to the one in December 2000. COP Verification Memo at 3; Eramet Conf. App.

_____

[5] "Standard financial accounting practice recognizes a hierarchy of generally accepted accounting principles. The highest authorities in the system of accounting norms are the statements published by the Financial Accounting Standards Board (FASB)." General Elec. Co. v. Delaney, 251 F.3d 976, 979 (Fed. Cir. 2001).

19

11. From this evidence, Commerce concluded that "it does not appear that transformer failures are unheard of in the silicomanganese industry." Issues and Decision Memo at Comment 4; Eramet Pub. App. 4. HEVENSA stated that because it considers transformers to have an expected useful life of fifteen years, it regarded the failure of the two transformers to be extraordinary because they failed after ten years. COP Verification Memo at 3; Eramet Conf. App. 11. Although HEVENSA believed the damage to the transformers was the result of an electrical storm, HEVENSA stated that it had not been able to determine the exact cause of the transformer failures. Id. at 20. It is not unreasonable to assume that HEVENSA's transformer failures, occurring within 6 months of each other of unknown causes, may simply have been a result of the transformers reaching the end of their expected useful lives and not the result of a force majeure, that could not reasonably be anticipated or controlled. Even if, as HEVENSA claims, no transformer meltdown had occurred in the more than twenty-year prior history of HEVENSA's silicomanganese production, Commerce still reasonably concluded that the failure was not an extraordinary event. Commerce has, in the past, found that even though a respondent may not have experienced a particular type of accident in the past (e.g., a steel producer experiencing a blast furnace accident), "industrial accidents are neither unusual nor unforeseen" in certain industries. Notice of Final Determination of Sales at Less Than Fair Value: Hot-Rolled Flat-Rolled Carbon-Quality Steel Products from Japan, 64 Fed. Reg. 24,329, 24,355 (May 6, 1999). HEVENSA simply has not provided sufficient evidence from which Commerce could find that the accident in this case was either an extraordinary event or produced extraordinary costs. Commerce merely drew permissible inferences from what evidence it had before it; because such inferences and the resulting conclusions are reasonable, this court will not overturn

them on review.

D
Commerce Acted Within its Discretion by Selecting the Date of Invoice Rather than the Contract Date as the Date of Sale

In reviewing HEVENSA's relevant transactions, Commerce "used the date of invoice as the date of sale for all of HEVENSA's home market sales," and similarly "considered the invoice date to be the date of sale of HEVENSA's U.S. sales." Preliminary Determination, 66 Fed. Reg. at 56,636-637. HEVENSA argues that Commerce should have used the date of contract, rather than the date of invoice, as the date of sale for HEVENSA's home market and sales.

Commerce will normally employ the invoice date as the date of sale for the subject merchandise at issue, if the invoice date is reflected in the respondent's records kept in the ordinary course of business. 19 C.F.R. § 351.401(i) (2002). However, Commerce has discretion to apply a date of sale other than invoice date if the agency is satisfied that another proposed date better reflects the date on which the material terms of sale are established. Id.; see also SeAH Steel Corp. v. United States, Slip Op. 01-20 at 5, 2001 Ct. Int'l Trade LEXIS 24 (Feb. 23, 2001) (citing Thai Pineapple Canning Indus. Corp. v. United States, 24 CIT 107 (Feb. 10, 2000), *aff'd in part*, *rev'd in part*, 271 F.3d 1077 (Fed. Cir. 2001)). Commerce has interpreted "'material terms of sale' to include price, quantity, and payment terms." SeAH Steel Corp., Slip Op. 01-20 at 5; see Cold-Rolled Flat-Rolled Carbon-Quality Steel Products from Brazil, 65 Fed. Reg. 5,554, 5,575 (2000); see also Stainless Steel Sheet and Strip in Coils from the Republic of Korea, 64 Fed. Reg. 30,664, 30,679 (1999). Only if the "'material terms' are not subject to change between the proposed date and the invoice date, or the agency provides a rational explanation as to why

21

the alternative date 'better reflects' the date when 'material terms' are established," may

Commerce "exercise its discretion to rely on a date other than invoice date for the date of sale."

Id.; see Thai Pineapple Canning Indus. Corp., 24 CIT 107.  However, even if the material terms

of sale are not subject to change, Commerce has the authority to nonetheless use the invoice date

as the date of sale; discretion in this instance means that Commere may use a date of sale other

than the invoice date, but is not required to do so.

For HEVENSA's home market sales, Commerce determined, in accordance with the

presumption found in its regulations, that the invoice date best represented the date on which the

essential terms of sale were set.  Issues and Decision Memo at 19-20; Eramet Pub. App. 4.

Specifically, Commerce explained its decision as follows:

> At verification we thoroughly examined the date of sale issue and found the
> information presented there further substantiated our position that date of invoice
> better represents date of sale.  For instance, while performing sales traces we found
> Hevensa's accounting records kept in the normal courts of business do not recognize
> a sale until the invoice is issued and payment is demanded.  More significantly, we
> reviewed numerous examples where either quantity or price (or both) changed after
> the date of contract, but prior to the invoice date.  We observed that changes occurred
> both for sales where Hevensa considers date of invoice to be the date of sale, as well
> as for sales where Hevensa considers the contract date to be the date of sale.  In
> essence, we noted that Hevensa made changes in the essential terms of sale between
> the contract date and invoice date for a significant percentage of its home market
> sales.

Id. at 20 (internal citations omitted).

Commerce also decided to use the date of invoice as the date of sale for HEVENSA's

U.S. sales.  Commerce made this decision based on its findings that at least one instance existed

"in which there was a change in price due to a decline in market prices between order and

shipment date."  Id.  Commerce concluded that "[s]ince changes in price can and do occur in the

22

U.S. market, we have determined that the date of invoice best reflects the date of sale, and have continued to use this date for the final determination." Id.

Commerce correctly applied the regulatory presumption in favor of invoice date in this case. "[T]he party seeking to establish a date of sale other than invoice date bears the burden of producing sufficient evidence to 'satisfy' the Department that 'a different date better reflects the date on which the exporter or producer establishes the material terms of sale.'" Allied Tube & Conduit Corp., 132 F. Supp. 2d at 1090. HEVENSA states in its brief before the court that "*most* of the time the essential terms remained unchanged after the date of contract." HEVENSA's Motion at 5 (emphasis added). In its submissions to Commerce, HEVENSA stated that "the [most] of such sales . . . involved sales where the essential terms did not change after the date of contract." Letter from Aitken Irvin Berlin & Vrooman to Honorable Donald Evans, Secretary of Commerce, U.S. Department of Commerce, International Trade Administration Re: Silicomanganese from Venezuela Investigation Submission (Nov. 27, 2001) ("HEVENSA Nov. 27 Letter") at 4; Eramet Conf. App. 12. Conversely, this means that for [all of the remaining] sales made pursuant to contracts within the POI, the terms of sale did change.[6] Commerce

_____

[6] After its November 27, 2001 submission, HEVENSA submitted it's November 29, 2001 statement of minor clarifications and minor corrections of previously submitted data. See HEVENSA Nov. 29 Letter; Defendant's Conf. App. at Tab C. In this submission, HEVENSA responded to Commerce's conclusion that HEVENSA made changes in the essential terms of sale between the contract date and the invoice date for a "significant" percentage of its sales by arguing that, in fact, "an [overwhelming majority] of HEVENSA's sales that might arguably be treated as sales within the POI (depending on whether date of contract or date of invoice is treated as date of sale) are sales where the essential terms (quantity and value) did not change after date of contract." Id. at 4. HEVENSA states that this "total universe" of sales includes . . . [most] of which involved sales where the essential terms . . . did NOT change from the terms of the contract after contract signing, with only [the remaining percentage] of such sales involving subsequent changes." Id. at 5. However, such pooling of the two universes of sales is improper because either date of contract or date of invoice is used to determine the date of sale: not both.

23

reasonably concluded that such information is not sufficient to compel a rejection of the regulatory presumption in favor of using the invoice date as the date of sale. See Antidumping Duties; Countervailing Duties, 62 Fed. Reg. 27,296, 27,349 (May 19, 1997) (stating that the invoice date presumption prevails "absent satisfactory evidence that the terms of sale were finally established on a different date"). Commerce did thus not abuse its discretion in refusing to use a date, other than the date of invoice, as the date of sale for HEVENSA's U.S. and home market sales.

E
Commerce Acted in Accordance with Law by Using an Interest Rate Calculated by the Federal Reserve to Calculate HEVENSA's Home Market Credit Expenses

In calculating normal value, 19 U.S.C. § 1677b(a)(6)(C) authorizes Commerce to adjust normal value to account for any differences (or lack thereof) between the export price (or constructed export price) and normal value that are wholly or partly due to differences in the circumstance of sale ("COS") between sales made in the U.S. and sales made in the foreign market under consideration. See SAA at 828. "Such COS adjustments are made when the seller incurs certain costs in its home market sales that it does not incur when selling to the United States market." Torrington Co. v. United States, 156 F.3d 1361, 1363 (Fed. Cir. 1998). The COS adjustments include adjustments for differences in direct selling expenses such as credit expenses. NTN Bearing Corp. of Am. v. United States, 104 F. Supp. 2d 110, 122 (CIT 2000); see SAA at 828. A COS adjustment for differences in credit expenses is made to account for the "producer's opportunity cost of extending credit to its customers. By allowing the purchaser to make payment after the shipment date, the producer forgoes the opportunity to earn

24

interest on an immediate payment." Mitsubishi Heavy Indus., Ltd. v. United States, 23 CIT 326, 330 (1999).

Commerce's preference is to use actual credit cost information if it is available; if actual expenses, however, are not available, the agency will "impute the cost of credit by determining the number of days payment is outstanding and the interest rate the company paid, or would have paid, if it had borrowed the same money (i.e., the same amount in the same currency) to finance its accounts receivable." International Trade Admin., U.S. Department of Commerce, Antidumping Manual, Ch. 8 at 23 (Jan. 22, 1997) ("AD Manual"). In computing imputed credit expenses, Commerce generally uses short-term interest rates for the currency of the transaction. Id. (stating that Commerce's "first choice in determining interest rates is to use the short-term rates actually experienced by the respondent in borrowing funds in the currencies involved during the period under investigation"). Respondents, however, do not always have short-term loans in U.S. dollars which Commerce can scrutinize to calculate an appropriate interest rate. If the respondent has no short-term borrowings, Commerce's "preference is to use U.S. prime rates for U.S. currency transactions and LIBOR+ rates for foreign currency transactions."[7] Id.; see also Import Administration Policy Bulletin 98.2: Imputed credit expenses and interest rates (Feb. 23, 1998) ("Policy Bulletin") (stating that in cases in which a respondent has no short-term borrowings in the currency of the transaction, Commerce "will use publicly available information to establish a short-term rate applicable to the currency of the transaction" and for "dollar transactions . . . will generally use the average short-term lending rates calculated by the Federal

---

[7] LIBOR stands for "London Interbank Offered Rate," and is the average interest rate paid on deposits of U.S. dollars in the London market.

Reserve to impute credit expenses").

In response to Commerce's questionnaires in the present investigation, HEVENSA reported that it did not have any U.S. dollar denominated short-term loans during the POI and that it thus calculated all the credit expenses based on the weighted average interest rate of the local currency (bolivars) denominated loans. HEVENSA's Response to the Department's Questionnaire Concerning Sections A, B, C, and D (Sept. 5, 2001); Prop. Doc. 58; Defendant's Conf. App. at Tab J. HEVENSA also reported that the value of its sales were "listed in U.S. dollars . . . because all local and Export Sales are invoiced in [currency]." HEVENSA's Response to the Department's Questionnaire Concerning Sections A (Aug. 6, 2001); Prop. Doc. 45; Defendant's Conf. App. at Tab M.

Commerce calculated HEVENSA's home market and U.S. credit expenses using the average short-term lending rates calculated by the Federal Reserve. Preliminary Determination, 66 Fed. Reg. at 56,638. Regarding HEVENSA's home market sales, Commerce explained its decision as follows:

> As noted in its . . . supplemental questionnaire response . . . HEVENSA did not have any U.S.-dollar denominated short-term loans during the POI. However, since all of HEVENSA's home market sales were [invoiced in [currency]], we have recalculated home market credit expenses in accordance with the policy explained in the Department's "Policy Bulletin 98.2: Imputed Credit and Interest Rates" (February 23, 1998). To recalculate home market credit expenses, we used the average POI short-term lending rate . . . published by the Federal Reserve.

Preliminary Analysis Memo at 5; Eramet's Conf. App. 2.

HEVENSA now argues that Commerce should not have used the U.S. Federal Reserve rate to calculate the imputed credit expenses for its home market sales because HEVENSA "always paid in bolivars, not U.S. dollars." HEVENSA Motion at 6. However, HEVENSA

26

explicitly stated that all its sales in the home market were invoiced in U.S. dollars. HEVENSA

further explained, in another questionnaire response, as follows:

> We invoice our home market customers in US dollars, because we want to avoid the negative effect of our local currency devaluation, which has exceeded 1% per month in recent years. We invoice in [currency], but ask the customer to pay in bolivares at the exchange rate of the day they actually make the payment of the invoice. This is the current practice in Venezuela, and is done by steel mills such as [one of HEVENSA's customers], when they invoice their local customers.

HEVENSA's Response to the Department's November 1, 2001 Supplemental Questionnaire

(Nov. 20, 2001); Pub. Doc. 99; Defendant's Conf. App. at Tab I. Commerce clarified this

practice in its sales verification report:

> Hevensa indicated that local customers are supposed to pay, in bolivares, the equivalent of the total price in U.S. dollars on the date of payment. If the bolivar devalues and the customer does not do this, Hevensa stated that it will issue a debit note to the customer for the difference.

Memorandum from Deborah Scott, Analyst, through Robert James, Program Manager, and

Michael Heaney, Team Leader, to The File, Verification of the Sales Information Submitted by

Hornos Electricos de Venezuela (HEVENSA) in the Investigation of Silicomanganese from

Venezuela (A-307-820) at 8 (Jan. 31, 2002); Defendant's Conf. App. at Tab F. Thus,

HEVENSA's invoicing practice allows for compensation by HEVENSA's customers for any

devaluation in the bolivar between the date of shipment and the date of payment. The customer

is, in effect, required to pay the U.S. dollar invoice price (converted to bolivars using the

exchange rate on the date of payment) and the only opportunity cost born by HEVENSA is the

cost of extending credit in U.S. dollars for the period that payment is outstanding.

Commerce has stated that "in developing a consistent, predictable policy establishing a

preferred surrogate U.S. dollar interest rate in all cases where respondents have no U.S. dollar

27

short-term loans," it employs three criteria: "(1) the surrogate rate should be reasonable; (2) it should be readily obtainable and predictable; and (3) it should be a short-term interest rate actually realized by borrowers in the usual commercial behavior in the United States." See Policy Bulletin. Commerce furthermore generally uses the average short-term lending rates calculated by the Federal Reserve because the rates meet the three criteria. In the present case, using a higher bolivar-denominated interest rate to calculate imputed credit expenses would overstate HEVENSA's home market imputed credit expenses and thus understate its home market prices; use of such a rate would therefore not be reasonable.

Furthermore, Commerce's practice "is to calculate imputed credit costs using a weighted-average short-term borrowing rate which reflects the currency in which the sale was *invoiced*." Notice of Final Determination of Sales at Less Than Fair Value: Certain Pasta From Turkey, 61 Fed. Reg. 30,309, 30,324 (June 14, 1996) (emphasis added); see Final Determination of Sales at Less Than Fair Value: Canned Pineapple Fruit from Thailand, 60 Fed. Reg. 107 (June 5, 1995); Final Determination of Sales at Less than Fair Value: Certain Carbon Steel Butt-Weld Pipe Fittings from Thailand, 60 Fed. Reg. 10,552 (Feb. 27, 1995). HEVENSA concedes that its home market sales were invoiced in U.S. dollars. Commerce thus reasonably acted in accordance with law and its prior practice in calculating HEVENSA's home market credit expenses using the short-term interest rate calculated by the Federal Reserve.

**V**
**Conclusion**

For the reasons state above, the court finds that Commerce's Final Determination is supported by substantial evidence and in accordance with law. HEVENSA's motion for

judgment upon the agency record is therefore denied, Commerce's Final Determination is sustained in its entirety, and this action is dismissed.

_____

Evan J. Wallach, Judge

Date:   August 29, 2003
         New York, New York