**SLIP OP. 06-8**

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: GREGORY W. CARMAN, JUDGE**

<table>
<tr><td>

WHEATLAND TUBE COMPANY and
ALLIED TUBE & CONDUIT CORPORATION,

                     Plaintiffs,

v.

UNITED STATES,

                     Defendant,

and

SAHA THAI STEEL PIPE COMPANY, LTD.,

                     Defendant-Intervenor.

</td><td>

Court No. 04-00568

</td></tr>
</table>

[Plaintiffs' Motion for Judgment on the Agency Record is granted in part and denied in part. Case remanded to the United States Department of Commerce for further proceedings consistent with this opinion.]

Schagrin Associates (Roger B. Schagrin), Washington, D.C., for Plaintiffs.

Peter D. Keisler, Assistant Attorney General, David M. Cohen, Director, Jeanne E. Davidson, Deputy Director, Civil Division, Commercial Litigation Branch, U.S. Department of Justice (David S. Silverbrand), for Defendant.

O'Melveny & Myers LLP (Veronique Lanthier & Greyson Bryan), Washington, D.C., for Defendant-Intervenor.

Dated: January 17, 2006

**OPINION & ORDER**

**CARMAN, JUDGE:** This case comes before the Court on Plaintiffs' Motion for Judgment

on the Agency Record. Plaintiffs, Wheatland Tube Company and Allied Tube & Conduit

Corporation, contest the treatment accorded certain duty drawback adjustments and § 201 duties[1]

by the United States Department of Commerce ("Defendant" or "Commerce") in Certain Welded

Carbon Steel Pipes and Tubes from Thailand ("Final Results"), 69 Fed. Reg. 61,649 (Dep't

Commerce Oct. 20, 2004) (final results). Based upon the reasons that follow, the Court finds for

Plaintiffs in part and Defendant in part and remands this case to Commerce for recalculation of

the antidumping ("AD") margin for Defendant-Intervenor, Saha Thai Pipe Company, Ltd. ("Saha

Thai" or "Respondent"), in a manner consistent with this opinion.

**PROCEDURAL HISTORY & FACTUAL BACKGROUND**

On April 21, 2003, Commerce issued a notice of initiation of an AD duty administrative

review for circular welded carbon steel pipes and tubes ("pipe") from Thailand. Initiation of

Antidumping and Countervailing Duty Administrative Reviews ("Notice of Initiation"), 68 Fed.

Reg. 19,498 (Dep't Commerce Apr. 21, 2003) (notice of initiation). Plaintiffs are U.S. producers

of pipe and were the petitioners in the administrative review. (Br. of Pls.' Wheatland Tube Co.

& Allied Tube & Conduit Corp. in Supp. of R. 56.2 Mot. for J. on the Agency R. ("Pls.' Br.") at

---

[1]Sections 201 and 203 of the Trade Act of 1974, 19 U.S.C. §§ 2251 and 2253 (2000) permit the President of the United States to impose safeguard measures in reaction to threats posed to domestic industry by identified imported items.

3.)  The period of review ("POR") was March 1, 2002, through February 28, 2003.  Notice of Initiation at 19,499.  The review involved a single Thai producer of subject pipe: Saha Thai.  Id.

On March 5, 2002, the President of the United States imposed § 201 safeguard duties on imports of certain steel products, including the subject pipe.  Proclamation No. 7529 ("Proclamation 7529"), 67 Fed. Reg. 10,553 (Mar. 7, 2002).  When entered for consumption between March 20, 2002, through March 19, 2003, the Proclamation 7529 mandated payment of an additional 15% duty on imported covered steel products.  Id. at 10,590.

On April 8, 2004, Commerce issued the preliminary results of the pipe administrative review.  Certain Welded Carbon Steel Pipes and Tubes from Thailand ("Preliminary Results"), 69 Fed. Reg. 18,539 (Dep't Commerce Apr. 8, 2004) (preliminary results).  Because Saha Thai is not affiliated with its U.S. customers, Commerce calculated the export price ("EP") of the subject pipe based upon the price from Saha Thai to the first unaffiliated U.S. purchaser in accordance with § 772(a) of the Tariff Act of 1930[2] (the "Act").  Id. at 18,540.

---

[2]Section 772(a) of the Act defines the "export price" as

the price at which the subject merchandise is first sold (or agreed to be sold) before the date of importation by the producer or exporter of the subject merchandise outside of the United States to an unaffiliated purchaser in the United States or to an unaffiliated purchaser for exportation to the United States, as adjusted under subsection (c) of this section.

19 U.S.C. § 1677a(a) (2000) (emphasis added).

As required by § 772(c)(2) of the Act,[3] Commerce deducted–where appropriate–foreign inland freight, foreign brokerage and handling, foreign inland insurance, bill of lading charges, ocean freight to the U.S. port, U.S. brokerage and handling charges, and U.S. duty. Id. During the preliminary review, Saha Thai requested that certain adjustments be made to the EP in accordance with § 772(c)(1)(B) of the Act. Section 772(c)(1)(B) requires that Commerce increase the EP by "the amount of any import duties imposed by the country of exportation which have been rebated, or which have not been collected, by reason of the exportation of the subject merchandise to the United States." 19 U.S.C. § 1677a(c)(1)(B) (2000) (emphasis added). Saha Thai claimed that it was eligible for an increase in EP due to its use of a Thai customs bonded warehouse, which entitled Saha Thai to an exemption from duties on imports of raw materials used in the manufacture of exported pipe. Prelim. Results, 59 Fed. Reg. at 18540. Upon verification, Commerce adjusted Saha Thai's EP upward to reflect the exempted import duties. Id.

During the preliminary review, Commerce also considered whether it should deduct from EP the § 201 duties Saha Thai paid upon importation of subject merchandise into the United States after March 20, 2002. Id. at 18,541. Because the agency had never before addressed this issue, Commerce made no adjustment to the EP for § 201 duties for purposes of the Preliminary Results. Id.

_____

[3]Section 772(c)(2)(A) of the Act requires that Commerce decrease EP by the amount of "any additional costs, charges, or expenses, and United States import duties, which are incident to bringing the subject merchandise from the original place of shipment in the exporting country to the place of delivery in the United States." 19 U.S.C. § 1677a(c)(2)(A) (2000).

After considering a number of other issues, Commerce calculated Saha Thai's preliminary weighted-average dumping margin at 2%. Id. at 18,542.

The Final Results differed from the Preliminary Results. Final Results, 69 Fed. Reg. at 61,649. In the Final Results, Commerce calculated Saha Thai's weighted-average margin to be 0.17%. Id. at 61,650. Because the margin in the final results was de minimis, Saha Thai's cash deposit rate for the POR was zero. Id. The variance between the Preliminary and Final Results is the effect of Commerce permitting Saha Thai to add certain billing adjustments for § 201 duties to the EP of the subject pipe and to minor corrections to the margin program. Id.

#### ISSUES PRESENTED

1.    Whether Commerce should exclude from EP § 201 duties paid by Saha Thai on subject goods imported into the United States.

2.    Whether Commerce should revise EP upward to reflect billing adjustments Saha Thai requested to account for post-sale invoices it dispatched to its customers.

3.    Whether Commerce erred in permitting Saha Thai to claim a drawback adjustment to EP absent proof that Saha Thai paid import duties on inputs used in the production of subject merchandise sold in the domestic market.

#### PARTIES' CONTENTIONS

### I.    Plaintiffs' Contentions

Plaintiffs raise two primary issues on review by this Court: Commerce's treatment of 1) § 201 duties applicable to Saha Thai's imports and 2) drawback adjustments requested by Saha Thai.

A.      Section 201 Duties

Plaintiffs take issue with Commerce's treatment of the § 201 duties for three reasons. First, Plaintiffs contend that Commerce's failure to deduct § 201 duties from the EP violates 19 U.S.C. § 1677a(c)(2)(A). (Pls.' Br. at 16.) Plaintiffs submit that § 201 duties are "import duties" that must be deducted from EP in compliance with the statute. Plaintiffs reason that if the § 201 duties are not deducted from EP they are transformed "into a credit against the antidumping margins that would otherwise exist." (Id. at 16-17.) Plaintiffs point out that the § 201 duty payment credit may completely eliminate dumping margins, as it did in this matter. (Id. at 17.) Further, Plaintiffs allege that had the § 201 duties remained in place for three or more years the § 201 duty credit "could result in a series of negative or de minimis results leading to the final revocation of the antidumping duty order and the termination of relief from unfair dumping." (Id.)

Second, Plaintiffs insist that it was improper for Commerce to permit upward adjustments to EP due to supplemental invoices Saha Thai issued to its customers for the § 201 duties. Plaintiffs maintain that "[t]he upward adjustment is improper on its face because the transaction price of the sale had already been established and the post-sale adjustment was attributable solely to the newly applicable Section 201 duty." (Id. at 18.)

Third, Plaintiffs claim that Commerce's treatment of § 201 duties "countermands the President's action" in imposing § 201 relief. (Id. at 19.) According to Plaintiffs, because the President's proclamation implementing § 201 acknowledged the on-going effect of AD duties,

Commerce's decision to accept § 201 "duty-inclusive prices" was a usurpation of the President's power and privilege to impose § 201 relief. (Id. at 18-19.)


        B.       Drawback Adjustments

Plaintiffs state that the rationale for the duty drawback adjustment is "to offset duties that are paid on inputs used in production of merchandise sold in the home market." (Id. at 9 (quotation & citation omitted).) Plaintiffs argue that Commerce failed to follow a "clearly enunciated" policy and "established statutory interpretation" that were designed to achieve the purpose of the drawback adjustment. (Id.) In support of its position, Plaintiffs cite an unrelated (to this case) Commerce final determination in Silicomanganese from Venezuela ("Silicomanganese"), 67 Fed. Reg. 15,533 (Dep't Commerce Apr. 2, 2002) (final determination). (Id.)

Plaintiffs seek to bind Commerce to the position it took in Silicomanganese, which Plaintiffs claim support their position here. Plaintiffs assert that the present case is similar to Silicomanganese, and therefore, the cases–absent justification–must be treated the same. (Id. at 12.) According to Plaintiffs, in Silicomanganese, Commerce denied drawback adjustments claimed by Hevensa (the respondent) because Hevensa failed to establish that it paid import duties on goods used to produce merchandise for the domestic market. (Id. at 10.) On review, this court upheld Commerce's denial of the Hevensa's claimed drawback adjustments. Hornos Electricos de Venezuela, S.A. (Hevensa) v. United States, 27 CIT __, 285 F. Supp. 2d 1353 (2003). Therefore, Plaintiffs argue that payment of duties on imported inputs used in production

of subject goods for sale in the domestic market must be proved before a respondent may avail itself of a drawback adjustment to EP.

Plaintiffs also argue that drawback adjustments should be treated like other circumstances of sales adjustments, "which 'are made when the seller incurs certain costs in its home market sales that it does not incur when selling to [the] United States market.'" (Id. at 15 (citation omitted).) Because Saha Thai had no duty costs for inputs used to produce subject goods sold in the domestic market, Plaintiffs' position is that no drawback adjustment should be allowed.

## II.     **Defendant's Contentions**

Defendant argues that § 201 duties are "special duties," which are not considered "United States import duties" for purposes of the Act and therefore are <u>not</u> deductible from EP. The government also contends that because Saha Thai satisfied the requisite two-pronged test, Commerce's allowance of the drawback adjustment was proper.

### A.     Section 201 Duties

Commerce argues that it is owed deference in its construction of 19 U.S.C. § 1677a(c)(2)(A), which requires deduction of "United States import duties" from EP. (Def.'s Mem. in Opp'n to Pls.' Mot. for J. upon the Agency R. ("Def.'s Br.") at 18.) In arriving at its statutory interpretation of "United States import duties," Commerce explains that it analyzed the legislative history of § 201. Commerce concluded that § 201 duties are not "United States import duties" and should be treated the same as AD and countervailing ("CV") duties, which are

Page 9

not deducted from EP. (Id. at 17.) Commerce reasons that–like AD and CV duties–§ 201 duties "are imposed following a determination of 'material injury.'" (Id. at 17-18.) Because AD and CV duties are "special duties," Commerce points out that this court has upheld Commerce's practice of not deducting them from EP. (Id. at 18.) Commerce claims that "deducting special duties would 'double-count' those duties." (Id. at 19.) Commerce maintains that "[t]o avoid such double-counting, it is therefore appropriate not to reduce the United States price in the amount of the section 201 duties." (Id.)

With regard to the upward adjustment to EP to reflect Saha Thai's price revisions for § 201 duties, Commerce insists that it "properly adjusted United States price to accurately reflect the sales price" because "Saha Thai's sales contracts were 'duty inclusive.'" (Id. at 21.) According to Commerce, the duty-inclusive sales price consists of a § 201 duty component that must be added to EP when separately invoiced to Saha Thai's unrelated United States customers. (Id.)

B.      Drawback Adjustments

Commerce explains that it has a long-standing practice of evaluating claims for a duty drawback adjustment pursuant to § 772(c)(1)(B) of the Act, 19 U.S.C. § 1677a(c)(1)(B), using a two-pronged test. (Id. at 9.) According to Commerce, the test is based upon the criteria set forth in the Act and requires the respondent to establish that

> (1) the import duties and rebates are directly linked to and are dependent upon one another, and (2) there are sufficient imports of raw materials to account for the duty drawback received on exports of the manufactured product.

(Id. at 10 (quotation & citation omitted).)  Commerce restates that "the statute requires that Commerce grant a duty drawback adjustment if (1) 'import duties [are] imposed' and (2) not collected 'by reason of the exportation of the merchandise to the United States.'" (Id. at 11 (quoting 19 U.S.C. § 1677a(c)(1)(B)) (brackets in original).)

Commerce notes that Plaintiffs do "not dispute that Saha Thai established that import duties are imposed upon the imported inputs it utilized to produce the Thai pipes exported to the United States, and that those duties were not collected because Saha Thai exported the Thai pipes to the United States." (Id. at 11-12.)  Further, Commerce is satisfied that "the Thai import duty regime satisfied prong one of Commerce's duty drawback test." (Id. at 12.)  During its verification, Commerce also confirmed that "Saha Thai had imported a sufficient quantity of raw materials to account for the [drawback duty] exemption." (Id.)  Thus, Commerce concluded that Saha Thai met the second prong of Commerce's test.

Commerce next asserts that "nothing in the legislative history suggests respondents must provide proof of import duties actually paid upon imported inputs used in the home market." (Id.)  Further, Commerce contends that the legislative history does not mandate that respondents consume duty-paid, imported inputs on subject goods sold in the domestic market to be eligible to receive a duty drawback adjustment. (Id. at 13.)

Commerce advises this Court that the court recently rejected Plaintiffs' argument that respondents must prove payment of import duties to be eligible for a drawback adjustment. (Id. (citing Allied Tube & Conduit Corp. v. United States, 29 CIT ___, 374 F. Supp. 2d 1257, 1261 (2005).)  Commerce points out that the Allied Tube court held that the "clear language of 19

U.S.C. § 1677a(C)(1)(B) [sic] does not require any inquiry into whether the price of products sold in the home market includes duties paid for imported inputs." (Def.'s Br. at 14 (quotation & citation omitted).)

Commerce argues that the court's ruling in Hevensa is inapposite. Commerce explains that in Hevensa an absence of evidence necessitated Commerce's request for further proof to substantiate the claim for a duty drawback adjustment. Commerce submits that "in Hevensa, the respondent failed to provide adequate documentation to validate its claims that duties were payable absent exportation." (Id.) Commerce did not encounter such an absence of evidence in this matter and urges this Court to find the same.

Lastly, Commerce notes that Plaintiffs do not challenge Commerce's finding that Saha Thai satisfied the two-pronged test. (Id. at 15.) Therefore, Commerce concludes that Saha Thai properly received a duty drawback adjustment to EP.

## III.    **Defendant-Intervenor's Contentions**[4]

Saha Thai claims that Commerce would improperly double-count the § 201 duties were the agency to require their deduction from EP. Saha Thai also maintains that there is no requirement that import duties be paid on inputs used in the production of subject merchandise sold in the domestic market to qualify for a drawback adjustment to EP. Lastly, Saha Thai suggests that Plaintiffs' misinterpreted the outcomes in Silicomanganese and Hevensa.

---

[4]In large part, Saha Thai's arguments mirror Commerce's. Only where they differ or provide further explanation does the Court note Saha Thai's arguments either here or in the Discussion section of this opinion.

A.      Section 201 Duties

According to Saha Thai, "deducting Section 201 duties from respondent's export price in an antidumping duty review would result in the imposition of double remedies, a scenario that is inappropriate and not [in] accordance with U.S. law or our WTO obligations." (Mem. in Opp'n to Pls.' Mot. for J. upon the Agency R. ("Resp't Br.") at 14.) Further, Saha Thai argues that § 201 duties should be considered similar to AD and CV duties for purposes of the deduction from EP for import duties. (Id.) Saha Thai reasons that § 201 duties and AD duties are analogous because both "are remedial in purpose and effect." (Id. at 15.) As Saha Thai's logic goes, because Commerce does not deduct AD duties from EP, it should also not deduct § 201 duties from EP. (Id. at 16-17.)

Saha Thai explains that § 201 safeguard duties are "designed to remedy the actual or potential injury to the domestic industry posed by the imports in question." (Id. at 18.) Saha Thai argues that

> deducting Section 201 duties from U.S. price cannot then be viewed as
> legitimately fulfilling the statutory goals of Section 201, as those objectives would
> have been already met by the application of Section 201 itself, a result not
> properly accomplished through the circular and duplicative antidumping margins
> that would be produced by deducting Section 201 duties.

(Id.)

Saha Thai notes that had Commerce not allowed the upward adjustment to EP for its § 201 reimbursements Plaintiffs likely would "have complained of absorption[5] of the Section 201

---

[5]Saha Thai's reference to "absorption" apparently refers to Commerce's regulation that it will "deduct the amount of any antidumping duty or countervailing duty which the importer or producer: (A) Paid directly on behalf of the importer; or (B) Reimbursed to the importer." 19

(continued...)

duties by Saha Thai." (Id. at 19.)  Therefore, Saha Thai argues that Commerce's treatment of the

§ 201 billing adjustments was proper.


B.        Drawback Adjustments

Saha Thai points out that Commerce has consistently applied the same two-part test in

determining whether a respondent is eligible for a drawback adjustment.  (Id. at 5.)  Saha Thai

reminds the Court that Plaintiffs concede that it met Commerce's two-pronged test.  In addition,

Saha Thai notes that Commerce's test does not require that the respondent "use imported inputs

to produce domestic merchandise and demonstrate that it has paid import duties on such inputs."

(Id. at 5-6.)  Further, Saha Thai presses that Commerce has specifically rejected adding "a third

prong requiring that a respondent demonstrate that it paid import duties on raw materials used in

the production of merchandise sold in the home market."  (Id. at 6.)  Moreover, Saha Thai

submits that there is no judicial precedent for requiring that "a respondent must use imported

inputs to produce domestic merchandise and demonstrate that it has paid import duties on those

imported inputs in order to receive a duty drawback adjustment."  (Id. at 8.)

Saha Thai places no weight on either Silicomanganese or Hevensa and posits that

Plaintiffs misunderstand the holding in the matters.  According to Saha Thai, the facts of

Silicomanganese differ from those before the Court.  In Silicomanganese, Saha Thai explains that

Hevensa used both imported and domestic inputs to produce subject merchandise for both

---

[5](...continued)
C.F.R. § 351.402(f) (2002) (emphasis added).  However, the regulation appears only to apply to
CV and AD duties and not to § 201 duties.

domestic and export markets. Although Hevensa's participation in Venezuela's duty drawback regime was not in dispute, Hevensa failed to prove that it was required to pay duty on the imported inputs used to produce subject goods for the domestic market. (Id.) Saha Thai states that "[g]iven that HEVENSA could not establish that the duty exemption was granted only for inputs used to produce export merchandise, [Commerce] could only conclude that the statutory requirement that the duty exemption be 'by reason of the exportation of the subject merchandise' was not met." (Id. at 9.) In other words, Saha insists that Silicomanganese and the court's holding in Hevensa relate to a failure of proof that "the import duty and rebate are directly linked and dependent on one another." (Id. at 5.) Saha Thai maintains that the Hevensa court upheld Commerce's imposition of a requirement that Hevensa prove payment of import duties on imported inputs used to produce domestic subject merchandise to establish "that the exemption granted under the circumstances of this case was in fact due to the exportation of the merchandise and not as part of a general scheme to exempt all inputs from duties." (Id. at. 9 (emphasis in original).) Because there has been no suggestion that Saha Thai would not have been required to pay duty on imported inputs for use to produce subject goods for the domestic market and because Commerce and this court have adhered to Commerce's two-pronged test in matters arising subsequent to Silicomanganese, Saha Thai urges this Court to uphold Commerce's treatment of its drawback adjustments. (Id. at 10-12.)

## JURISDICTION

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1581(c) (2000).

## STANDARD OF REVIEW

I.    **Substantial Evidence**

In reviewing a challenge to Commerce's final determination in an AD administrative review, the Court will uphold Commerce's decision unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." Tariff Act of 1930, § 516A(b)(1)(B) (codified as amended at 19 U.S.C. § 1516a(b)(1)(B)(i) (2000)). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938) (citations omitted); see also Micron Tech., Inc. v. United States, 117 F.3d 1386, 1393 (Fed. Cir. 1997) ("'Substantial evidence' has been defined as 'more than a mere scintilla,' as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"). "As long as the agency's methodology and procedures are reasonable means of effectuating the statutory purpose, and there is substantial evidence in the record supporting the agency's conclusions, the court will not impose its own views as to the sufficiency of the agency's investigation or question the agency's methodology." Ceramica Regiomontana, S.A. v. United States, 10 CIT 399, 404-05, 636 F. Supp. 961 (1986) (citations omitted), aff'd, 810 F.2d 1137 (Fed. Cir. 1987).


II.    **Agency Deference**

In determining whether Commerce's interpretation and application of the antidumping statute is "in accordance with law," the Court must undertake a two-step analysis. First, the

Court must consider "whether Congress has directly spoken to the precise question at issue." Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842 (1984). If so, the matter is at an end. Id.

If the statute is silent or ambiguous concerning the issue before it, the Court must assess whether the agency's interpretation of the statute is reasonable. See, e.g. NSK Ltd. v. United States, 26 CIT 650, 654, 217 F. Supp. 2d 1291 (2002) ("[T]his is an inquiry into the reasonableness of Commerce's interpretation."). To evaluate whether Commerce's statutory interpretation is reasonable, the Court will consider several factors, including, but not limited to, the following: "the express terms of the provisions at issue, the objectives of those provisions and the objectives of the antidumping scheme as a whole." Id.

"[A] court must defer to an agency's reasonable interpretation of a statute even if the court might have preferred another." Koyo Seiko Co., Ltd. v. United States, 36 F.3d 1565, 1570 (Fed. Cir. 1994) (citation omitted). The Court owes Commerce deference in these cases because it has special expertise in administering AD law. Ta Chen Stainless Steel Pipe, Inc. v. United States, 298 F.3d 1330, 1335 (Fed. Cir. 2002); see also Koyo Seiko, 36 F.3d at 1570 ("[A]n agency's statutory interpretation is at its peak in the case of a court's review of Commerce's interpretation of the antidumping laws.").

## DISCUSSION

For the reasons that follow, the Court finds that Commerce's allowance of the § 201 duty billing adjustments and import duty drawback adjustments were proper and in accordance with

law.  However, the Court finds that Commerce's failure to deduct § 201 duties from EP was

unreasonable and not in accordance with law.  Therefore, this case is affirmed in part and

remanded to Commerce for recalculation of Saha Thai's AD margin after deduction of § 201

duties from EP.


I.        **Section 201 Adjustments**

        In their motion for judgment on the agency record, Plaintiffs argue that Saha Thai should

not be allowed to increase the EP of the subject pipe by the amount of the § 201 billing

adjustments.  Plaintiffs also argue that Saha Thai should be required to deduct the amount § 201

duties from the EP because they are "import duties" within the meaning of the statute.  The Court

disagrees with Plaintiffs on the first point and agrees with Plaintiffs on the second.


        A.        Billing Adjustments

        The President's imposition of § 201 duties occurred after Saha Thai entered into sales

contracts that resulted in imports of subject pipe.  Upon importation, Saha Thai paid the § 201

duties and later issued invoices to its customers for the § 201 duties.  Saha Thai issued the

invoices, which are presently at issue, to account for the increase in the price of the subject pipe

due to the imposition of the § 201 duties after Saha Thai's sales contracts were negotiated.

Issues & Decision Mem. for the Antidumping Duty Admin. Review of Certain Welded Carbon

Steel Pipes & Tubes from Thailand ("Decision Memorandum"), A-549-502, POR 02-03, at 4

(Oct. 5, 2004), available at http://www.ia.ita.doc.gov/frn/summary/thailand/E4-2727-1.pdf.

Commerce permitted the billing adjustments because Saha Thai executed the duty-inclusive sales contracts for which the billing adjustments were claimed before the § 201 duties became effective on March 20, 2002. Id. at 5. (See also Def.'s Br. at 21.) Commerce verified Saha Thai's payment of § 201 duties and re-invoicing of its U.S. customers and found no discrepancies. Dec. Mem. at 5. Consequently, Commerce added the billing adjustments to Respondent's EP. Id.

The § 201 billing adjustments represent part of the actual prices paid for subject pipe by Saha Thai's unaffiliated customers in the United States. As such, the billing adjustments form part of the EP. Therefore, the billing adjustments for § 201 duties that Commerce permitted were based upon substantial evidence and otherwise in accordance with law.[6]

B.      Deduction from EP

Whether § 201 duties must be deducted from EP in accordance with section 772 of the Act, 19 U.S.C. § 1677a(c)(2)(A),[7] as "United States import duties" is a question of first impression. Plaintiffs argue that § 201 duties are "United States import duties" that Commerce is required to deduct from EP. The Court agrees.

---

[6]In its reply brief, Plaintiffs concede this point. (Reply Br. of Pls. to Mem. of Def., the United States, & Def. Intervenor, Saha Thai, in Opp'n to Mot. for J. on the Agency R. ("Pls.' Reply") at 14-15 ("To be clear, Wheatland is not objecting to Commerce's addition of Saha Thai's section 201 billing adjustments to Saha Thai's originally-contracted prices, because the addition of the billing adjustments to the negotiated prices establishes the actual prices paid by the unaffiliated purchasers in the United States for sales involving billing adjustments.").)

[7]See supra note 4.

Because Congress did not define "United States import duties," the Court must determine whether it is reasonable for Commerce to interpret the statute to exclude § 201 duties. See NSK, 26 CIT at 654. While Commerce's determination need not be the only possible outcome, Koyo Seiko, 36 F.3d at 1570, the interpretation generally must meet the objectives of the statute, NSK, 26 CIT at 654. The Court finds that Commerce's failure to deduct § 201 duties from EP does not satisfy the objectives of the statute or trade remedy legislation–in general–and is, therefore, not in accordance with law.

In interpreting the phrase "United States import duties," this Court looks first to the statute itself. Chevron, 467 U.S. at 842-43. The Trade Act does not define "United States import duties." However, the Trade Act of 1974, which gives rise to the dispute over the deductibility of § 201 duties, does provide guidance on the meaning of the phrase and Congress' intention.

Section 201 of the Trade Act of 1974 permits the President to impose safeguard measures in reaction to threats posed to domestic industry by identified imported goods. Section 202(d)(1)(A) of the Trade Act of 1974 directs the International Trade Commission ("ITC") to "recommend the action that would address the serious injury, or threat thereof." 19 U.S.C. § 2252(e)(1) (2000). One such action that the ITC may recommend is "an increase in, or the imposition of, any duty on the imported article." 19 U.S.C. § 2252(e)(2)(A) (2000) (emphasis added). By way of Proclamation 7529, the President imposed "an increase in duties on imports" of the subject merchandise. 67 Fed. Reg. at 10,555 (emphasis added). Section 601(1) of the Trade Act of 1974 defines "duty" as including "the rate and form of any import duty, including

but not limited to tariff-rate quotas." 19 U.S.C. § 2481(1) (emphasis added). Clearly, Congress

envisioned that the duties imposed under § 201 would be considered "import duties" for

purposes of the legislation.[8]

Commerce undertook a different analysis in interpreting the phrase "United States import

duties" and concluded that the legislative history of the provision distinguishes between "special

duties" and "normal duties." (Def.'s Br. at 17.) According to Commerce, "special duties" need

not be deducted from EP pursuant to 19 U.S.C. § 1677a(c)(1)(B), while "normal duties" must be

deducted.

In support of its position, Commerce cites the Senate report that accompanied the

Antidumping Act of 1921, which referred to AD duties as "special dumping duties" and to

"normal customs duties" as "United States import duties." Stainless Steel Wire Rod from the

Republic of Korea ("SSWR"), 69 Fed. Reg. 19,153, 19,159 (Dep't Commerce Apr. 12, 2004)

(final results).[9] From this reference, Commerce deduced that

---

[8]Plaintiffs assert that the Supreme Court has defined import duties as "charges which are collected on, or in connection with, the importation of goods." (Pls.' Reply at 5 (quoting Itel Containers Int'l Corp. v. Huddleston, 507 U.S. 60, 65 (1993).) While this definition is helpful to Plaintiffs' case, the Supreme Court was merely quoting the definition of "import duties and taxes" ascribed by the Customs Convention on Containers ("Convention"), Dec. 2, 1972, Art. I, 988 U.N.T.S. 43. The question of defining an "import duty" was not before the Supreme Court, and the Supreme Court did not adopt, as Plaintiffs suggest, the Convention's definition of "import duties" for all purposes.

[9]Because Commerce had not previously considered the deductibility of § 201 duties, the agency requested public comments. Antidumping Proceedings: Treatment of Section 201 Duties and Countervailing Duties, 68 Fed. Reg. 53,104 (Dep't Commerce Sept. 9, 2003) (request for public comment). In SSWR, Commerce discussed the various comments submitted from the public and from the petitioners and the respondents in SSWR and provided a detailed analysis of its position on the matter. Because Commerce relied on SSWR in its Decision Memorandum for

(continued...)

Congress has long recognized that at least <u>some</u> duties implementing trade remedies–including at least antidumping duties–are special duties that should be distinguished from ordinary customs duties. Accordingly, Commerce consistently has treated AD duties as special duties not subject to the requirement to deduct "United States import duties" (normal customs duties) from U.S. prices [EP] in calculating dumping margins.

<u>Id.</u> (emphasis added).

Even Commerce leaves open the possibility that "some" "special duties" may also be "normal customs duties" that must be deducted from EP as "United States import duties." The Court finds that § 201 duties are such duties, though the Court is reluctant to ratify the terminology of "special duties" and "normal customs duties" adopted by Commerce.

Commerce likens § 201 duties to AD duties because "section 201 duties are imposed only following a determination of injury." (Def.'s Br. at 20.) <u>See also</u> <u>SSWR</u>, 69 Fed. Reg. at 19,159-60 ("201 duties are imposed only following a finding of serious injury to the industry in question"). This is simply a misstatement of the law. The President may impose § 201 duties after an ITC finding that "an article is being imported into the United States in such increased quantities as to be a substantial cause of serious injury, <u>or the threat thereof</u>, to the domestic industry." 19 U.S.C. § 2251(a) (2000) (emphasis added). Because no actual injury to domestic industry is necessary prior to the imposition of § 201 duties, Commerce is incorrect to suggest that § 201 duties are the product of a review "akin to antidumping duties." (Def.'s Br. at 21.)

---

[9](...continued)
this case, the Court can infer that Commerce's justification for its treatment of § 201 duties derives not only from Commerce's brief and Decision Memorandum, but also from Commerce's position as set forth in <u>SSWR</u>.

AD duties are intended to offset price discrimination from overseas competitive industries. The AD duty rate generally is established for an individual manufacturer based upon a complicated analysis of economic, manufacturing, cost, price, and other data. Commerce must then revise EP based upon an array of statutorily-dictated adjustments before it can compare EP to normal value. Once Commerce completes these complex calculations, the agency can determine the dumping margin and appropriate AD dumping deposit rate or final cash deposit rate.

In contrast, § 201 duties are set forth by Presidential fiat to counter a surge in imports. Unlike AD duties, § 201 duties are not "intended to offset the effect of discriminatory pricing between . . . two markets." AK Steel Corp. v. United States, 21 CIT 1265, 1280, 988 F. Supp. 594 (1997), aff'd, 215 F.3d 1342 (Fed. Cir. 1999) (quotation & citation omitted). Rather, § 201 duties are remedial duties designed to provide "temporary relief for an industry suffering from serious injury, or the threat thereof, so that the industry will have sufficient time to adjust to the freer international competition." S. Rep. No. 93-1298, at 119 (1974) (emphasis added). Because they specifically address two distinct types of harms, AD and § 201 duties may be "complementary," but they are not "interchangeable," as Commerce suggests. SSWR, 69 Fed. Reg. at 19,161. Simply because § 201 and AD duties are each remedial in nature does not–as Saha Thai urges–create a "single trade practice." (Resp't Br. at 17.)

Section 201 duties are "not intended to protect industries which fail to help themselves become more competitive through reasonable research and investment efforts, steps to improve productivity and other measures that competitive industries must continually undertake." S. Rep.

No. 93-1298, at 122.  Moreover, it is clear from the legislative history of § 201 that Congress did

not intend for § 201 duties to replace–or be "interchangeable" with–AD duties.

> The [International Trade] Commission would be required, whenever in the course
> of its investigation it has reason to believe that the increased imports are
> attributable in part to circumstances which come within the purview of the
> Antidumping Act, the countervailing duty statute (section 303 of the Tariff Act of
> 1930), the unfair import practices statute (section 337 of the Tariff Act of 1930),
> or other remedial provisions of law, to notify promptly the appropriate agency so
> that such action may be taken as is otherwise authorized by such provisions of
> law.  Action under one of those provisions when appropriate is to be preferred
> over action under this chapter.  This provision is designed to assure that the
> United States will not needlessly invoke the escape-clause (article XIX of the
> GATT) [§ 201] and will not become involved in granting compensatory
> concessions or inviting retaliation in situations where the appropriate remedy may
> be action under one or more U.S. laws against unfair competition for which no
> compensation or retaliation is in order.

Id. at 122-23 (emphasis added).  The legislative history enunciates that Congress expects that

Commerce will address antidumping using the appropriate trade remedy laws and that § 201 is

not an appropriate remedy for antidumping.  In fact, Congress recognizes that to attempt to

remedy antidumping by way of § 201 would be in violation of the United States' obligations

under the General Agreement on Tariffs and Trade (GATT).  It does not follow from this

legislative history that "to the extent that 201 duties may lower the dumping margin, this is a

legitimate remedy for dumping."  (Dec. Mem. at 3 (quoting SSWR, 69 Fed. Reg. at 19,160).)

Further, "[i]n determining whether to provide relief [pursuant to § 201] and, if so, in what

amount, the President will continue the practice of taking into account relief provided under

other provisions of law, such as the antidumping and countervailing duty laws."  Uruguay Round

Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316, Vol. 1, at 964

(1994) ("SAA").  Thus, the Court may presume that when setting the level of § 201 duties the

President took into consideration the existing AD orders on the affected products. Given that AD duties and § 201 duties are designed to remedy distinct harms, the Court may also presume that the President would not expect that Commerce would revise AD duties downward in response to the President's action.

Commerce seems to agree and reasons that "any adjustment for the potential overlap between 201 and AD remedies is to be made by the President in setting the level of the 201 duties." SSWR, 69 Fed. Reg. at 19,160 (emphasis added). Further, Commerce claims that "it is not Commerce's place to upset that balance by subtracting the 201 duties from U.S. prices [EP] in calculating dumping margins." Id. However, by its failure to deduct § 201 duties, Commerce has effected the very result that it intended to avoid. By failing to deduct § 201 duties from EP, Commerce improperly negates the § 201 duty imposed by the President, artificially decreases Respondent's AD margin, and upsets the balance between § 201 and AD duties. This result is aptly demonstrated by the elimination of Saha Thai's dumping margin from the preliminary results to the final determination.[10]

---

[10]Had Saha Thai not issued the billing adjustments, Commerce would presume that § 201 duties were included in Saha Thai's sales price. (Pls.' Reply at 11 n.10, 13-14); see also SSWR, 69 Fed. Reg. at 1,159 n.18. Thus, the risk of creating a dumping margin where none previously existed would depend wholly on the respondent's allocation and absorption of its selling expenses. See Def.'s Br. at 19; SSWR, 69 Fed. Reg. at 19,160. The method by which exporters and producers allocate and absorb expenses is always a consideration in the administration of AD laws. Commerce should treat § 201 duties no differently than any other deductible movement charge (i.e., foreign inland freight, foreign brokerage and handling, foreign inland insurance, bill of lading charges, ocean freight to the U.S. port, U.S. brokering and handling charges, and U.S. duty) to Saha Thai .

This Court does not take issue with Commerce's long-standing position not to deduct AD duties from EP in calculating the dumping margin. This court, see id. at n.23, and Congress, see id. at n.25, have sanctioned this practice for good reason: deducting AD duties from EP would result in double-counting AD duties. See, e.g., Hoogovens Staal BV v. United States, 22 CIT 139, 146, 4 F. Supp. 2d 1213 (1998) ("deducting antidumping duties as costs or import duties from U.S. price would, in effect, double-count the margin"); AK Steel, 21 CIT at 1280 ("making an additional deduction from [United States price] for the same antidumping duties that correct this price discrimination would result in double-counting" (quotation & citation omitted)).

Plaintiffs explain that "Commerce has traditionally not deducted AD duties from the EP or [constructed export price] because the AD duty is the result of the AD margin calculation, and not a component of it. Thus, deducting AD duties in determining the EP or [constructed export price] double-counts the AD duty, once as a component of the calculation of the duty, and a second time as the AD duty itself." (Pls.' Reply at 7 (emphasis added).) Because § 201 duties are not determined based upon a margin calculation, no such double-counting occurs with § 201 duties. In fact, Commerce acknowledges that no "circular logic" affects the consideration of whether to deduct § 201 duties, as it does with AD duties.[11] SSWR, 69 Fed. Reg. at 19,159.

Double-counting is not the only justification for not deducting AD duties from EP. This court has previously found that AD duties are not deductible from EP pursuant to 19 U.S.C. § 1677a(c)(2)(A) because deposits of estimated dumping duties may not accurately reflect the

---

[11]"Circular logic" refers to the double-counting that would occur if AD duties were deducted from the EP used to calculate the very dumping margin that is then used to determine the AD dumping duty deposit rate. (Def.'s Br. at 19.)

final deposit rate calculated by Commerce. Federal-Mogul Corp. v. United States, 17 CIT 88,

108, 813 F. Supp. 856 (1993). The court held that Commerce should "deduct estimated import

duties from [United States price] only to the extent that the actual duties to be collected can be

determined at the time [Commerce] is calculating the current dumping margins." Id. The court

found that Commerce correctly deducted "only deposits of the actual normal import duties owed

which [could] be accurately determined." Id. (emphasis added).

Commerce concedes that § 201 duties are import duties, albeit a "special type." SSWR,

69 Fed. Reg. at 19,160. Federal-Mogul supports the finding that import duties must be deducted

from EP if they "can be determined at the time [Commerce] is calculating the current dumping

margins." 17 CIT at 108. Unlike AD duties, § 201 duties are fixed and certain at the time of

importation. Proclamation 7529, 67 Fed. Reg. at 10,557, 10,590. Therefore, Commerce and

Saha Thai cannot argue that § 201 duties deposited at importation do not accurately reflect the

final duty to be assessed. Thus, Commerce must deduct from EP the § 201 duties, which are

accurate, fixed, and determinable, when Commerce calculates the current dumping margin. See

Federal-Mogul, 17 CIT at 108. Commerce did not act in accordance with law when it failed to

make such a deduction.

In further considering the application of section 772(c)(2)(A) of the Act, 19 U.S.C.

§ 1677a(c)(2)(A), to AD duties, this court noted that

> If Commerce were to deduct existing antidumping duties as a matter of course in
> its administrative review, it would reduce the U.S. price [EP]–and increase the
> margin–artificially. As discussed earlier, an antidumping order is designed to
> raise the price of dumped goods to a fair level in the import market. It is not a
> normal import duty or extra "cost" or "expense" to the importer–it is an element
> of a fair and reasonable price.

Hoogovens Staal, 22 CIT at 146 (emphasis added). As the Hoogovens Staal court indicated, AD

duties–and by extension CV duties, see AK Steel, 21 CIT at 1280–are not deductible from EP

because they are part of the "fair and reasonable price" of the imported subject goods, as opposed

to deductible costs, expenses, or United States import duties. Hoogovens Staal, 22 CIT at 146.

The same cannot be said for § 201 duties because § 201 duties are not intended to redress price

discrimination.

In addition, Commerce's failure to deduct § 201 duties "violates the fundamental

principle of antidumping law." (Pls.' Br. at 17 n.8.) This principle requires that Commerce

adjust EP to permit comparison of EP and normal value at a "'common' point in the chain of

commerce." Smith-Corona Group v. United States, 713 F.2d 1568, 1572 (1983). Commerce

defines the "common" point for purposes of the comparison of EP to normal value as ex-factory.

Dep't Commerce, Import Administration, Antidumping Manual ("AD Manual"), at 13 (1998).[12]

The Trade Act requires Commerce to deduct from EP "additional costs, charges, or

expenses, and United States import duties, which are incident to bringing the subject

merchandise from the original place of shipment in the exporting country to the place of delivery

in the United States." 19 U.S.C. § 1677a(c)(2)(A). Because § 201 duties are incurred after the

point of shipment and are not–like AD duties–part of the "fair and reasonable price" of the

subject merchandise, Hoogovens Staal, 22 CIT at 146, § 201 duties fall within the ambit of

---

[12]Plaintiffs note that Smith-Corona suggests that the "common" point for comparison may be "f.o.b. foreign port." (Pls.' Reply at 14 (quoting Smith-Corona, 713 F.2d at 1572).) Because defining the common point for comparison is not relevant to the outcome of this case, the Court defers to Commerce's conclusion that the common point is the "factory at which the merchandise was produced." AD Manual at 13.

"United States import duties."  Commerce acknowledges as much.  <u>SSWR</u>, 69 Fed. Reg. at 19,160 ("While 201 duties are a special type of import duty, they are nevertheless a species of import duty, and are thus covered, if at all, by the phrase 'United States import duties.'")  Further, in its questionnaire response, Saha Thai itself described the § 201 duties it paid as "additional expenses incurred for shipping merchandise to the United States."  (App. of Docs. in Supp. of Def.'s Mem. in Opp'n to Mot. for J. upon the Agency R., Tab 1 (Antidumping Questionnaire Resp.) at 2.)  Thus, Commerce must treat § 201 duties as deductible movement charges in accordance with 19 U.S.C. § 1677a(c)(2)(A).

It is clear from legislation and the legislative history that Congress intended § 201 duties to be considered "import duties."  Further, because AD and § 201 duties are intended to redress dissimilar trade distortions and are calculated in methods unique to each, it is not reasonable for Commerce to treat the two types of duties similarly for purposes of section 772(c)(2)(A) of the Tariff Act of 1930, 19 U.S.C. § 1677a(c)(2)(A).  Commerce's failure to deduct § 201 duties from EP vitiates § 201 duties, arbitrarily reduces Saha Thai's dumping margin, and obstructs the purpose of both § 201 and AD trade remedies.  Moreover, Commerce can accurately determine the amount of § 201 duties at the time the AD margin is calculated.  Therefore, Commerce's failure to deduct § 201 duties from EP was not in accordance with law.  Accordingly, this Court remands this matter to Commerce to recalculate Saha Thai's dumping margin after deducting § 201 duties from EP in accordance with 19 U.S.C. § 1677a(c)(2)(A).

## II.    Duty Drawback Adjustment

Section 772(c)(1)(B) of the Tariff Act, 19 U.S.C. § 1677a(c)(1)(B), requires Commerce to increase EP for eligible duty drawback received in the respondent's home market.  This practice is commonly known as a "duty drawback" adjustment.  The duty drawback adjustment is limited to "the amount of any import duties imposed by the country of exportation which have been rebated, or which have not been collected, by reason of the exportation of the subject merchandise to the United States."  19 U.S.C. § 1677a(c)(1)(B) (emphasis added).  The duty drawback adjustment is intended to prevent dumping margins from being created or affected by the rebate or exemption of import duties on inputs used in the production of exported merchandise.  See Hevensa, 285 F. Supp. 2d at 1358; Allied Tube, 374 F. Supp. 2d at 1261.

> In other words, a duty drawback adjustment takes into account any difference in the prices for home market or normal value and export sales accounted for by the fact that such import duties have been paid on inputs used to produce the merchandise sold in the home market, but have not been paid on inputs used to make the merchandise exported to the United States.

Hevensa, 285 F. Supp. 2d at 1358.

To determine whether a respondent is eligible for a duty drawback adjustment, Commerce developed a two-pronged test.  (Def.'s Br. at 9.)  The test requires the respondent to establish that

> (1) the rebate and import duties are dependent upon one another, or in the context of an exemption from import duties, if the exemption is linked to the exportation of the subject merchandise; and (2) the respondent has demonstrated that there are sufficient imports of the raw material to account for the duty drawback on the exports of the subject merchandise.

Allied Tube, 374 F. Supp. 2d at 1261. The first prong establishes a link between an import duty imposed and a rebate or exemption from such duty. Avesta Sheffield, Inc. v. United States, 17 CIT 1212, 1215, 838 F. Supp. 608 (1993). In addition, the first prong enables Commerce to verify that the home country allows rebates or exemptions only for those imported inputs used to produce exported merchandise. "The second prong of the test focuses more specifically on the respondents'[sic] conduct and requires the foreign producer to demonstrate that it has imported a sufficient amount of raw materials to account for the drawback received upon export of the finished product." Id. at 1216 (citation omitted). This court has consistently upheld Commerce's two-pronged test to assess duty drawback eligibility. (Def.'s Br. at 10.) See also Avesta Sheffield, 17 CIT at 1215.

Both Commerce (Def.'s Br. at 11-12) and Saha Thai (Resp't Br. at 3) assert that Saha Thai satisfied Commerce's two-pronged duty drawback eligibility test. Further, both Commerce (Def.'s Br. at 11-12) and Saha Thai (Resp't Br. at 6) claim that Plaintiffs concede that Saha Thai met Commerce's two-pronged test. The Court defers to Commerce on whether Saha Thai satisfied the two-pronged test and agrees that Plaintiffs concede this point.

The issue before this Court is not whether Saha Thai satisfied the two-pronged test or even whether the two-pronged test is valid. Rather, the issue before this Court is whether–in addition to complying with the two-pronged duty drawback eligibility test–Saha Thai must establish that it paid duty on imported inputs used in the production of subject merchandise sold in the domestic market. (Pls.' Br. at 2.) This Court finds that there is no requirement in the statute or in Commerce's reasonable interpretation thereof that Saha Thai prove that it paid duty

on imported inputs used in the production of subject merchandise sold in the domestic market to qualify for a duty drawback adjustment.

Plaintiffs rely on Silicomanganese and this court's subsequent opinion in Hevensa in support of their position. As Commerce and Saha Thai point out, Plaintiffs' reliance is misplaced. The court's holding in Hevensa is limited to the facts before that court, which are distinguishable from the facts before this Court.

Like this matter, Hevensa involved the application of a duty drawback exemption program. Hevensa, 285 F. Supp. 2d at 1359. Venezuela, Hevensa's home country, operated a duty exemption regime whereby Hevensa was "exempt from paying, rather than receiving a rebate on, import duties on certain inputs used to produce silicomanganese for export." Id. In verifying whether Hevensa was eligible for a duty drawback adjustment to EP, "Commerce examined whether import duties were not collected (i.e., exempted) on imported inputs because those inputs were used to produce silicomanganese that was exported." Id. The petitioners asserted that "Hevensa did not pay duties on imported materials used in the production of silicomanganese sold during the POI in either the home or export markets." Issues & Decision Mem. for the Final Determination of the Antidumping Investigation of Silicomanganese from Venezuela, A-307-820, POI 00-01, at cmt.6 (Apr. 2, 2002), available at http://www.ia.ita.doc.gov/frn/summary/venezuela/02-7953-1.txt. The silicomanganese petitioners noted that Hevensa's total consumption of certain inputs was nearly identical to the amount of those same inputs on which Hevensa claimed duty exemption. Id. Thus, the petitioners contended that "Hevensa did not pay import duties on those inputs, regardless of

whether they were used to produce silicomanganese sold in the home market or export markets during the POI." Id. The petitioners insisted that Hevensa must provide Commerce with evidence that it paid duties on a percentage of raw materials equal to the percentage of home market sales to total silicomanganese sales. Id. Commerce agreed with the petitioners that Hevensa was not eligible for a duty drawback adjustment. Id.

Both Commerce (Def.'s Br. at 14) and Saha Thai (Resp't Br. at 9) submit that Silicomanganese and Hevensa involve a failure of proof. According to Commerce and Saha Thai, Hevensa failed to satisfy the first prong of the duty drawback eligibility test. As Commerce stated, Hevensa "failed to provide adequate documentation to validate its claims that duties were payable absent exportation." (Def.'s Br. at 14.) This court recently considered very similar arguments in Allied Tube, 374 F. Supp. 2d. at 1259.

In Allied Tube, the court rejected the plaintiffs' assertion that to qualify for a duty drawback adjustment the respondent was required to prove that it paid import duties on inputs used in the production of subject merchandise sold in the domestic market. Id. at 1261. In reaching its decision, the court analyzed Hevensa and held that

> Hevensa did not create a separate, third prong to the duty drawback test. Rather, the Court [sic] affirmed the first prong of Commerce's test whereby a party seeking a duty drawback adjustment must demonstrate that either rebate and import duties are dependent on one another, or that exemption from import duties is linked to exportation of the subject merchandise.

Allied Tube, 374 F. Supp. 2d at 1263. The Court also considered whether it was relevant that the respondent "did not pay any import duties on raw materials used to produce subject merchandise for the home market." Id. The court concluded that Commerce's decision to grant the duty

drawback adjustment was reasonable because Commerce found that the drawback regime was reliable and that the respondent satisfied both prongs of the duty drawback eligibility test.[13]

This Court finds no reason to deviate from the court's well-reasoned decision in Allied Tube. "The clear language of 19 U.S.C. § 1677a(c)(1)(B) does not require an inquiry into whether the price for products sold in the home market includes duties paid for imported inputs." Id. at 1262. The Trade Act "allows a full upward adjustment," Avesta, 17 CIT at 1216, to EP for the duties "which have not been collected," 19 U.S.C. § 1677a(c)(1)(B). Further, this Court explicitly rejects Plaintiffs' "contention that, as a prerequisite to receiving [a] duty drawback [adjustment], a company must demonstrate the payment of duties upon raw materials used to produce merchandise sold in the home market." Allied Tube, 374 F. Supp. 2d at 1261.

Insofar as Plaintiffs do not challenge Commerce's finding that Saha Thai satisfied the two-pronged duty drawback eligibility test, this Court finds Commerce's allowance of the duty drawback adjustment reasonable and in accordance with law.

---

[13]The court noted that the respondent provided Commerce with evidence that it paid duties on some imported inputs used for production of subject merchandise sold in the domestic market, but the court did not rely upon this evidence in reaching its conclusion.

## CONCLUSION

For the reasons stated herein, the Court finds that Commerce's allowance of § 201 duty billing adjustments and import duty drawback adjustments were reasonable and in accordance with law. However, the Court finds that Commerce's failure to deduct § 201 duties from Respondent's EP was not reasonable and not in accordance with law. Therefore, this case is affirmed in part and remanded to Commerce for recalculation of Saha Thai's AD margin after deduction of § 201 duties from EP. Commerce's remand results must be filed with the United States Court of International Trade on or before March 1, 2006.


                                        /s/        Gregory W. Carman
                                        Gregory W. Carman



Dated: January 17, 2006.
        New York, New York

**ERRATUM**

<u>Wheatland Tube Co. v. United States</u>, Court No. 04-00568, Slip Op. 06-8, dated January 17, 2006:

       Page 21, the last sentence on the page is revised to read

       While AD duties may be imposed after a finding that a domestic U.S. industry "is threatened with <u>material injury</u>," Tariff Act of 1930 § 733(a), 19 U.S.C. § 1673b(a) (2000) (emphasis added), Commerce is incorrect to suggest that § 201 duties are the product of a review "akin to antidumping duties," (Def.'s Br. at 21).

January 19, 2006